UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| David F. McDaniel, | ) | Civil Action No. 8:09-CV-02418-DCN-BHH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on United States Magistrate Judge Bruce H. Hendricks's report and recommendation ("R&R") that this court affirm the decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g). Plaintiff has filed timely written objections to the R&R. For the reasons set forth below, the court adopts the R&R and affirms the decision of the Commissioner denying the plaintiff's application for DIB.

## I.  BACKGROUND

Plaintiff first filed for DIB in March of 2006, alleging he became disabled in March 2005 due to residual injuries from a fractured left ankle, including traumatic arthritis, back problems, numbness in his left arm, as well as subsequent pain and depression. Tr. 104-08, 134, 151, 324, 329, 388. His application was denied in an initial determination and upon reconsideration by the Social Security Administration. Tr. 78-84, 88-90. Plaintiff requested an administrative hearing

1

which was held on November 18, 2008.  Tr. 19, 45-77, 91.  On February 17, 2009, the

Administrative Law Judge ("ALJ") issued an unfavorable decision, finding plaintiff was not

disabled because he could perform a range of unskilled light work and could perform jobs that

exist in significant numbers in the national economy.  Tr. 7-18.  On July 15, 2009, the Appeals

Council rendered the Commissioner's determination final when it denied plaintiff's request to

review the ALJ's decision.  Tr. 1-4.

        Plaintiff was born on October 6, 1958.  Tr. 49.  He has a high school education and

attended two years of college, but did not obtain a degree.  Tr 49, 141.  He has past relevant

work experience as a meat cutter, retail and restaurant manager, and corrections officer.  Tr. 51-

55,

72-73, 125-32, 135.  On February 12, 2005, plaintiff injured his left ankle during an attempt to

subdue an inmate while working as a correctional officer.  Tr. 52-53, 181-93.

        Plaintiff was initially treated at the emergency room at Greenville Memorial Hospital.

Tr.  181-93.  Since then,  plaintiff has seen a variety of medical professionals.  On February 21,

2005, plaintiff visited the Anderson Orthopaedic Clinic where x-rays revealed a left ankle lateral

malleolus fracture.  Tr. 240.  Dr. Larry D. Ratliff placed plaintiff in a short leg walking cast.  Tr.

240.  Dr. Ratliff examined plaintiff again on February 28, 2005, and reported that he was

"bearing weight in the cast and doing reasonably well but complaining of pain."  Tr. 239.  On

March 21, 2005, Dr. Ratliff observed that x-rays revealed the fracture was "healing in [a] good

position."  Tr. 238.  Dr. Ratliff ordered that plaintiff be fitted with an ankle support, and "given a

slip to return to light duty if available, especially limited standing and walking."  Tr. 238.  On

April 11, 2005, Dr. Ratliff sent plaintiff to the Anderson Area Medical Center for a venous

2

ultrasound, because he suspected plaintiff might have deep vein thrombosis ("DVT").  Tr. 237.

After undergoing venous scanning, plaintiff was admitted to the hospital and treated for acute

DVT.  Tr. 194-219.  Plaintiff was discharged from the hospital on April 14, 2005.  Tr. 194-95.

Plaintiff's discharge sheet noted that "he had much less pain[;] he was actually able to

ambulate."  Tr. 194.

      Plaintiff saw Dr. Ratliff three more times, and the doctor noted that plaintiff still had

some mild swelling and tenderness of the ankle.  Tr. 234-36.  Dr. Ratliff ordered plaintiff to

physical therapy.  Tr. 234.

      During this time, plaintiff also visited Dr. Sidharth Patel five times.  Tr. 220-23.  On his

first visit on April 20, 2005, plaintiff indicated that he felt well overall but that he continued to

have pain in his left leg and ankle.  Tr. 223.  His affect and mood were normal.  Tr. 223.  On

May 18, 2005, plaintiff complained of pain, but Dr. Patel noted that plaintiff had "a minimal left

limp" and climbed onto the exam table without difficulty.  Tr. 222.  In June, plaintiff said that he

still had leg pain, but Dr. Patel observed that there was no swelling.  Tr. 221.  Plaintiff's affect

and mood were again noted as normal.  Tr. 221.  On his final visit on October 25, 2005, Dr. Patel

stated that plaintiff's "left ankle is much better" and that plaintiff had "no other new complaints."

Tr. 220.  Dr. Patel also observed that plaintiff's left ankle and leg had no swelling or deformity,

and that he had "minimal if any limp."  Tr. 220.  Plaintiff felt ready to go to work.  Tr. 220.

      Plaintiff also saw Dr. Samuel W. Capra, Jr. at Anderson Bone and Joint Clinic and

Anderson Orthopaedic Clinic five times during 2005.  Tr. 224-33.  In June 2005, Dr. Capra took

x-rays and ordered an MRI of plaintiff's left ankle.  Tr. 232.  The MRI suggested incomplete

healing of the left ankle, and Dr. Capra went "back to the beginning," placing plaintiff in a

walker boot.  Tr. 230.  On August 8, 2005, Dr. Capra's examination revealed "significantly less effusion and less swelling and edema in the ankle and surrounding tissues."  Tr. 228.  Dr. Capra instructed plaintiff to continue to use the walker boot, and to restrict his activities to "essentially clerical-type duties with minimal standing."  Tr. 228.  On September 19, Dr. Capra noted that plaintiff was able to bear weight as tolerated in the walker boot without an assistive device and seemed much more comfortable overall.  Tr. 226.  Dr. Capra referred plaintiff to physical therapy.

Plaintiff went to physical therapy at AnMed VBS Rehabilitative Services for fifteen visits from September 21 through November 2, 2005.  Tr. 244-65.  The discharge summary stated that plaintiff had a normal gait, no tenderness, no edema, and good tolerance, compliance and progress at the end of treatment.  Tr. 244-45.   Overall, the discharge summary noted a "moderately improved" outcome.  Tr. 245.

On November 8, 2005, Dr. Capra recorded that plaintiff's stated subjective pain was out of proportion to the physical exam and noted that plaintiff had a full range of motion of the ankle but some mild lateral edema and tenderness.  Tr. 224.  Dr. Capra referred him to a pain clinic for evaluation and possible treatment of reflex sympathetic dystrophy ("RSD").  Tr. 224, 327.

Dr. Eric Loudermilk of Piedmont Comprehensive Pain Management first saw plaintiff on November 14, 2005, and records show that he continued to treat plaintiff through October, 2008.  Tr. 318-29, 388-401.  Dr. Loudermilk is a board-certified anesthesiologist with fellowship training in pain management.  Tr. 352.   On his initial assessment, Dr. Loudermilk stated that plaintiff had "persistent left ankle pain, status post fibula fracture and probable traumatic arthritis, unlikely reflex sympathetic dystrophy, anger and mood liability and probable

4

depression." Tr. 327-29. Dr. Loudermilk ordered another MRI and prescribed medications for pain, including Lidoderm patches, Arthrotec, and hydrocodone. Tr. 329.

Dr. O. Alex Hicklin, III of Mountainview Medical Imaging performed the MRI of plaintiff's left ankle and foot on November 21, 2005. Tr. 242-43. The MRI revealed "no persistent malalignment" and "no residual marrow edema is demonstrated to suggest an acute injury/fracture." Tr. 242. A posterior inferior calcaneal spur was noted, but "no significant disruption of ligaments or tendons about the ankle joint." Tr. 242.

Dr. Loudermilk reviewed the MRI results and stated that there was no evidence of RSD. Tr. 326. Dr. Loudermilk found that plaintiff did not have a surgical condition and would do best with medications and physical therapy. Tr. 326. Dr. Loudermilk referred plaintiff to Magnolia Physical Therapy and prescribed two additional medications, Lorcet and Paxil, along with continued use of Arthrotec and Lidoderm patches. Tr. 326.

Plaintiff began physical therapy at Magnolia Physical Therapy on December 5, 2005. Tr. 371-73. He completed fifteen sessions of a work conditioning program with physical therapist ("PT") Matt P. Brandel between December 5, 2005 and January 12, 2006. Tr. 356-71. During physical therapy, plaintiff demonstrated mild improvement in standing tolerance. Tr. 365, 367. However, plaintiff "continued to have elevated complaints of limited activity, despite improvement in objective findings." Tr. 366. There was no increased edema noted, and plaintiff was still able to demonstrate a full range of motion and completed all requested activities despite his pain complaints. Tr. 356-61. PT Brandel again noted that "there is little objective confirmation correlating with pain complaints." Tr. 361.

During a visit on December 19, 2005, Dr. Loudermilk stated that the "Paxil has definitely

5

improved his anger and mood swings." Tr. 325.  Dr. Loudermilk again prescribed Lorcet, Paxil, Arthrotec and Lidoderm patches and said plaintiff needed to do more physical therapy.  Tr. 325.

On January 17, 2006, plaintiff underwent a functional capacity evaluation ("FCE").  Tr. 266-93.  Test results placed plaintiff in the heavy work category.  Tr. 266.  The FCE results indicated that the plaintiff met or exceeded the majority of essential job demands for return to his previous employment, but it was noted that he would require accommodations for limited walking and crouching.  Tr. 266.  Plaintiff had more pain complaints for the lumbar and left knee than the left ankle during the FCE testing.  Tr. 266.  The recommended impairment rating was 19% for the left ankle, which translated to 8% for the whole person.  Tr. 266.

When plaintiff visited Dr. Loudermilk ten days later on January 27, 2006, Dr. Loudermilk's assessment was (1) chronic mechanical left ankle and foot pain status post tibia and fibula fractures, (2) probable traumatic arthritis of the left ankle and foot, and (3) depression and mood instability.  Tr. 324.  Dr. Loudermilk's treatment notes from this date do not contain any notations of plaintiff's back pain.  Tr. 324.  Dr. Loudermilk prescribed Lorcet, increased his Paxil dosage, continued him on Arthrotec and Lidoderm patches, and added a prescription for Lyrica.  Tr. 324.

On a visit on February 24, 2006, Dr. Loudermilk noted that plaintiff is "still complaining of pain in his ankle and foot but the pain is manageable with a combination of Lorcet, Arthrotec, Lyrica and Lidoderm Patches.  He also takes Paxil for neuropathic pain and mood swings.  He has noticed a big difference since starting Lyrica."  Tr. 322.  Dr. Loudermilk stated that he felt that plaintiff was "on an appropriate regimen of pain medications."  Tr. 322.  However, Dr. Loudermilk also stated that "Mr. McDaniel is unable to return to his job as a prison guard.  His

job demands exceed his abilities as a prison guard and it is my professional opinion that he will not be able to return to this type of work." Tr. 294, 323.

During an examination on March 23, 2006, plaintiff complained of lower back pain and some numbness in the outer two fingers of his left hand. Tr. 320. Dr. Loudermilk "explained that his low back pain is due to compensating for the pain in his foot as well as some weight gain." Tr. 320. This was Dr. Loudermilk's first notation of back pain in his treatment notes. Tr. 320. The doctor also noted that his current pain medications were "a good combination of medications" and that plaintiff was "at maximum medical improvement." Tr. 320.

A month later, plaintiff again complained of numbness in his left hand and lower back pain. Tr. 319. Dr. Loudermilk stated that plaintiff was "doing well with his medications and he tolerates the medicine without any side effects." Tr. 319. "The Paxil has helped significantly in reducing his anger and depression." Tr. 319. Dr. Loudermilk refilled plaintiff's prescriptions for Lorcet, Arthrotec, Lyrica, Paxil, and Lidoderm patches. Tr. 319. Dr. Loudermilk also wrote a prescription for a velcro back support. Tr. 319. On a visit on July 12, 2006, Dr. Loudermilk recorded that plaintiff felt "that this is a good combination of medications for him and he is very pleased with his pain management." Tr. 399. Dr. Loudermilk again refilled plaintiff's prescriptions and recommended continued use of his transcutaneous electrical nerve stimulation ("TENS") therapy "since it helps." Tr. 399.

On July 20, 2006, Dr. Loudermilk completed a residual functional capacity ("RFC") questionnaire for plaintiff. Tr. 352-55. When asked to identify the clinical findings and test results that show the patient's medical impairments, Dr. Loudermilk specifically referred to the comprehensive FCE performed on January 17, 2006 at Magnolia Physical Therapy. Tr. 352.

Though supposedly referring to the January FCE, Dr. Loudermilk's answers on the questionnaire indicated that plaintiff could only sit for one hour at a time, stand for ten minutes at a time, sit for six hours in an eight hour day, and walk less than two hours in an eight hour day. He stated that plaintiff could walk less than one city block before needing to rest and needed a cane or assistive device. Tr. 354. Interestingly, there is no evidence in the record that Dr. Loudermilk ever prescribed a cane or other assistive device for plaintiff. He said that plaintiff could only occasionally twist, crouch/squat, and climb stairs, and would miss four days of work per month. Tr. 352-55. Dr. Loudermilk's statements on the RFC questionnaire were in sharp contrast to the results of the FCE administered six months earlier. The January FCE test results indicated that plaintiff demonstrated abilities to meet specified job demands for the heavy work category including high lift, low lift, full lift, carry fifty pounds, balance, crawl, kneel, climb stairs, sit, and stand.

During plaintiff's subsequent visits with Dr. Loudermilk in September and November 2006, Dr. Loudermilk noted that plaintiff "tolerates the medicines without any side effects and the medications are necessary to improve his pain and give him a better quality of life." Tr. 397-98. "He also using a TENS unit which has helped his low back pain. He is pleased with his results of his medications and his pain management." Tr. 398. No side effects of the medications were reported, and the TENS unit therapy was described as "very helpful" in easing the plaintiff's lower back pain. Tr. 397-98.

On January 5, 2007, plaintiff stated that he still had pain in his ankle and back, but Dr. Loudermilk noted that the medications "have done a very good job at keeping his pain manageable and improving problems with depression and anxiety due to his work injury." Tr.

8

396.  On March 2, 2007, plaintiff's pain was "stable" and the medications were working well with no side effects.  Tr. 395.  In April and June, plaintiff's pain remained stable and well controlled with the medications.  Tr. 319, 392- 94.

In August and December 2007, Dr. Loudermilk noted that plaintiff "looks the best he has looked since I have been taking care of him."  Tr. 389, 391.  In eight visits between August 2007 and October 2008, plaintiff remained stable, and Dr. Loudermilk noted that the "medications improve his pain and his quality of life."  Tr. 388-91, 401-04.

Plaintiff also saw Dr. Nicholas Lind of Post Trauma Resources for an attorney-sponsored independent medical evaluation on March 6, 2008.  After a sixty minute interview, Dr. Lind diagnosed plaintiff with post traumatic stress disorder ("PTSD"), severe depression and severe anxiety, and recommended psychotherapy and psychiatric treatment.  On exam, plaintiff's attitude was cooperative, he was alert and oriented in all spheres, his psychomotor activity was normal, and he could attend and maintain focus during the evaluation.  Tr. 385-86.

State agency doctors also reviewed the medical records.  In May 2006, Dr. George Chandler completed a physical RFC assessment.  Tr. 310-17.  In this assessment, Dr. Chandler determined that plaintiff could perform medium work and stand and/or walk for about six hours in an eight hour workday, sit for about six hour in an eight hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl.  Tr. 310-17.  Dr. Chandler determined that plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds.  Tr. 311.  Dr. Chandler indicated that treating/examining source conclusions about the claimant's limitations or restrictions were not significantly different from his findings.  Tr. 316.  Dr. Chandler stated that "although alleged, [the medical record] does not support severe impairment related to back, left

arm or hand numbness.  [I]mpairments all appear related to ankle fracture."  Tr. 312.

Dr. William Hopkins also completed an RFC assessment on June 13, 2006.  Tr. 330-37.
Dr. Hopkins determined that plaintiff could perform medium work, sit, stand and/or walk for
about six hours in an eight hour workday, occasionally climb and crouch, and frequently stoop,
kneel, balance, and crawl.  Tr. 332.  Dr. Hopkins noted that the plaintiff's pain was out of
proportion to expected and objective findings.  Tr. 335.

At the hearing before the ALJ on November 18, 2008, plaintiff testified that the
medications eased his pain and helped decrease his depression, but complained of back pain and
numbness in his left arm.  Tr. 57-58.  Plaintiff said that he could walk or stand for ten to twenty
minutes before needing to sit down and could sit for about thirty minutes.  Tr. 60.  He stated that
he could lift thirty pounds frequently.  Tr. 60.  Plaintiff said his daily activities included driving,
cooking, shopping, light housework, and cutting grass with a riding lawnmower.  Tr. 64-65.
Plaintiff said that he suffered from depression but that Xanax had improved his anger.  Tr. 57.

Dr. Benson Hecker, a vocational expert ("VE"), also testified at the hearing before the
ALJ.  Tr. 71-76.  Dr. Hecker testified that a hypothetical claimant with vocational and functional
limitations similar to plaintiff's would be able to perform management work in retail or in a
restaurant, clerical work, file clerk, cashier, or retail sales.  Tr. 73.  He stated that such a person
with additional limitations and work limited to simple, routine, and repetitive tasks and with only
occasional contact with the public could not perform jobs similar to plaintiff's past work
experience.  Tr. 74.  However, Dr. Hecker testified that there would still be light work at
unskilled levels in the regional economy that a person could perform assuming the vocational and
functional limitations described.  Tr. 74-75.  Dr. Hecker estimated that there would be 1,000-

1,500 jobs in the region, and nationally over a million of these light, unskilled jobs available such as packer, machine operator, and assembler.  Tr. 74-75.  Dr. Hecker stated that he relied on the "Dictionary of Occupational Titles" in forming his opinions.  Tr. 75.  See 20 C.F.R. § 404.1560(b)(2).

The ALJ determined that although plaintiff had severe impairments including traumatic left ankle arthritis, mechanical low back pain, obesity, depression, and PTSD, he was not disabled within the meaning the Social Security Act.  Tr. 10-18.  The ALJ determined that while the claimant was unable to perform past relevant work, he nevertheless retained RFC to perform unskilled light jobs that exist in significant numbers in the national economy.  Tr. 17-18.

The ALJ followed the five-step sequential evaluation process to determine whether plaintiff was disabled.  Tr. 10-18.  See 20 C.F.R. § 404.1520(a)(4).  First, the ALJ found plaintiff had not engaged in substantial gainful activity since he alleged he became disabled on March 1, 2005.  Tr. 11-12.  Second, the ALJ found that plaintiff had traumatic left ankle arthritis, mechanical low back pain, obesity, depression, and PTSD, impairments that were "severe" withing the meanings of the regulations.  Tr. 12.  See 20 C.F.R. § 404.1520(c) (an impairment is "severe" if it "significantly limits [an individual's] physical or mental abilities to do basic work activities").  Third, the ALJ found that plaintiff's impairments were not presumptively disabling.  Tr. 12.  Fourth, the ALJ found that plaintiff had the RFC to lift and carry twenty pounds occasionally and ten pounds frequently, and could walk or stand for six hours and sit for six hours during an eight hour workday.  Tr. 13.  The ALJ found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Tr. 13.  The ALJ stated that claimant was additionally limited in that he could perform simple, routine, repetitive tasks with occasional contact with the

11

public.  Tr. 13.  Concluding the fourth step, the ALJ found that plaintiff's RFC did not enable him to perform any past relevant work.  Tr. 17.

The burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy.  20 C.F.R. §§ 416.920(f), 404.1520(f); Powers v. Apfel, 207 F.3d 431, 436 (7th Cir. 2000) (citing Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987)); Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The Commissioner can carry his burden in the final step with the testimony of a VE.  Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983).  "The purpose of bringing in a [VE] is to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).

At the fifth step, the ALJ must determine whether plaintiff is able to do any other work considering his age, education, work experience, and RFC.  Tr. 12.  See 20 C.F.R. §§ 404.1520, 404.1560(c).  The ALJ determined that plaintiff had the RFC to perform a range of light work, impeded by additional postural limitations and concentration deficits.  Tr. 16-17.  Relying on the testimony of the VE Dr. Hecker, the ALJ found that the claimant, given all the factors, could perform the requirements of light and unskilled occupations, of which over a million jobs existed in the national economy.  Therefore, the ALJ found plaintiff was not disabled, as defined in the Social Security Act, and therefore was not entitled to DIB.  Tr. 18.  See 20 C.F.R.§ 404.1520(g).

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which a specific, written objection is made.  28 U.S.C. § 636(b)(1).  A party's

failure to object is accepted as agreement with the conclusions of the magistrate judge.  See
Thomas v. Arn, 474 U.S. 140 (1985).  This court is not required to review, under a de novo
standard, or any other standard, the factual findings and legal conclusions of the magistrate judge
to which the parties have not objected.  See id. at 149-50.  A party's general objections are not
sufficient to challenge a magistrate judge's findings.  Howard v. Sec'y of Health & Human
Servs., 932 F.2d 505, 508-09 (6th Cir. 1991).  The recommendation of the magistrate judge
carries no presumptive weight, and the responsibility to make a final determination remains with
this court.  Mathews v. Weber, 423 U.S. 261, 270-71 (1976).  This court may accept, reject, or
modify the report of the magistrate judge, in whole or in part, or may recommit the matter to the
magistrate judge with instructions for further consideration.  28 U.S.C. § 636(b)(1).

      Although this court may review the magistrate judge's recommendation de novo, judicial
review of the Commissioner's final decision regarding disability benefits "is limited to
determining whether the findings of the [Commissioner] are supported by substantial evidence
and whether the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.
1990).  "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion.  It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance.  If there is evidence to justify a refusal to direct a
> verdict were the case before a jury, then there is "substantial
> evidence."

Id. (internal citations omitted).  "[I]t is not within the province of a reviewing court to determine
the weight of the evidence, nor is it the court's function to substitute its judgment for that of the
[Commissioner] if his decision is supported by substantial evidence."  Id.  Instead, when
substantial evidence supports the Commissioner's decision, this court must affirm that decision

13

even if it disagrees with the Commissioner.  Blalock v. Richardson, 483 F.2d 773, 773 (4th Cir.

1972). "Under the Social Security Act, [a reviewing court] must uphold the factual findings of

the Secretary if they are supported by substantial evidence and were reached through application

of the correct legal standard."  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).  "In reviewing

for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make

credibility determinations, or substitute [its] judgment for that of the Secretary."  Mastro v.

Apfel, 270 F.3d 171, 176 (4th Cir. 2001)(quoting Craig 76 F.3d at 589).  "Ultimately, it is the

duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to

make findings of fact and to resolve conflicts in the evidence."  Hays, 907 F.2d at 1456.

## III.  DISCUSSION

The Social Security Act defines "disability" as the "inability to do any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  To meet this

definition, the claimant must have a severe impairment that makes it impossible to do past

relevant work or any other substantial gainful work that exists in the national economy.  20

C.F.R. §§ 404.1505(a), 416.905(a).

Plaintiff contends that the magistrate judge erred in concluding that the findings of the

ALJ were supported by substantial evidence.  Specifically, plaintiff objects to the ALJ's reliance

on the opinions of state agency doctors over that of the treating doctor.  Plaintiff also objects to

the ALJ's refusal to give controlling weight to the opinion of the treating physician or at least

weighing his opinion using all the factors provided in 20 C.F.R. § 404.1527.  The basis for these

objections are synonymous.

## A.  Disability Determination Services Physicians' Opinions

Plaintiff contends that the state agency doctors' opinions are based on incomplete evidence unlike that of Dr. Loudermilk, and, as such, are not supported by substantial evidence and should not be given controlling weight over the opinion of the treating physician.  The ALJ's opinion demonstrated that careful consideration was given to the entire record.  The state agency doctors' opinions were not given controlling weight, rather the ALJ based its conclusions on Dr. Loudermilk's observations and augmented its findings with the Disability Determination Services ("DDS") opinions, which were "essentially consistent with the objective medical evidence of record."  Tr. 16.  Furthermore, both DDS physicians' opinions were based on their conclusions of all medical evidence in the record and not exclusively on the FCE.  Tr. 16, 310, 330.  The FCE revealed that plaintiff could perform work in the heavy category, with only frequent, but not constant, walking and only occasional crouching.  Tr. 15, 266-293.  The ALJ concluded that plaintiff was only capable of light work, with additional limitations.  Tr. 16-17.

Plaintiff has alleged that the FCE was no longer an accurate description of his limitation after he developed back problems after the FCE.  However, there is no evidence in the medical record of the effect of plaintiff's lower back pain on his functional capacity that would preclude him from performing light work.  Both state agency doctors' opinions mention plaintiff's back pain, while still finding the plaintiff capable of medium work.  Tr. 16, 312, 331.  The January FCE also specifically notes that plaintiff complained of lumbar pain during the administration of the FCE.  Tr. 266.  Therefore, it follows that the state agency doctors' opinions did account for plaintiff's lower back pain, yet still found he was capable of almost a full range of medium

exertional activities, with some postural limitations.  Dr. Chandler's assessment of May 9, 2006, notes that "although alleged, [the medical record] does not support severe impairment related to back, left arm or hand numbness.  Impairments all appear related to ankle fracture."  Tr. 312. Dr. Hopkins assessment of June 13, 2006 mentions "some LBP [low back pain] due to pain in LLE [lower left extremity] compensation."  Tr. 331.  Dr. Hopkins also noted the plaintiff's subjective complaints of pain were out of proportion to expected and to objective findings.  Tr. 335.

In May 2006, Dr. Craig Horn reviewed plaintiff's medical records and completed a psychiatric review.  Tr. 296-309.  Dr. Horn noted that plaintiff's medical impairment was not severe, and that plaintiff would have only mild  functional limitations due to his mental distress and depression.  Tr. 296, 299, 306, 308.   On June 19, 2006, Dr. Lisa Varner reviewed the January FCE, Dr. Loudermilk's progress notes and all other medical records for a psychiatric review, and gave controlling weight to Dr. Loudermilk's L2 of May 2006.  Tr. 338-51.  Both doctors found that plaintiff did not have a severe mental impairment.  Tr. 296-209, 338-51.  Dr. Varner concluded that "[o]verall, claimant's symptoms and impairments impose minimal limitations on the ability to perform basic work functions."  Tr. 350.  The ALJ gave plaintiff "the full benefit of the doubt," and found that "due to irritability and concentration deficits, the claimant can only perform simple, routine, repetitive tasks with occasional contact with the public."  Tr. 17.  The ALJ ascribed to plaintiff the additional impairments based on Dr. Loudermilk's opinions and treatment notes.  Tr. 15-17.

While the DDS's doctors considered the January FCE when making their assessments, this was not the exclusive evidence cited in their medical opinions.  Tr. 296-309, 310-17, 330-51.

All DDS physicians found the plaintiff capable of performing almost a full range of medium

exertional level activities, with some postural limitations, but no mental limitations.  Tr.  306,

308, 310-17, 330-37, 350.  See Smith v. Schweiker, 795 F.2d 343, 345-46 (4th Cir. 1986)

(opinion of a non-examining physician can constitute substantial evidence to support the

decision of the Commissioner); Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984) ("[T]he

testimony of a non-examining, non-treating physician should be discounted and is not substantial

evidence when totally contradicted by other evidence in the record.  However,... the testimony of

a non-examining physician can be relied upon when it is consistent with the record.

Furthermore, if the medical expert testimony from examining or treating physicians goes both

ways, an ALJ's determination coming down on the side on which the non-examining, non-

treating physician finds himself should stand.") (citations omitted).

It is clear that there is substantial medical evidence that support the ALJ's finding that

plaintiff was limited in his work ability but could perform at such a light unskilled level

described by the ALJ.  The opinions of the DDS doctors are consistent with the entire medical

record, and there is no indication of error in the ALJ crediting these opinions, as they were not

given precedent over Dr. Loudermilk's consistent and complete opinions.

**B.        Dr. Loudermilk's Opinions**

Plaintiff alleges that the ALJ refused to give controlling weight to the treating doctor, or

at least, weigh the treating doctor's medical opinion using all the factors provided in 20 C.F.R. §

404.1527.  However, a review of the record shows that the ALJ gave controlling weight to the

treating physician's opinions, along with evidence "essentially consistent with the objective

medical evidence of record."  Tr. 16-17.

17

The regulations state that every medical opinion is evaluated, and unless a treating source's opinion is given controlling weight, factors are used to decide the weight given to medical opinions.  These factors include:  (1) examining relationship, (2) treatment relationship including length of treatment and frequency of examination and nature and extent of the treatment relationship, (3) supportability of opinion afforded by medical evidence, (4) consistency of opinion with the record as a whole, and (6) specialization of the physician.  See 20 C.F.R. § 404.1527(d).

The ALJ gave greater weight to the records of Dr. Loudermilk as treating physician, as plaintiff sought treatment from him most frequently over a three year period.   The Commissioner's regulations state that "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).        As discussed above, Dr. Loudermilk stated that plaintiff suffered from ankle and foot pain due to fracture and neuralgia, traumatic arthritis, and depression.  Tr. 352-55. In March 2006, Dr. Loudermilk noted plaintiff had "pain in his lower back . . . due to compensating for the pain in his foot as well as some weight gain."  Tr. 320.  There is no mention in the record or discussion by Dr. Loudermilk as to the functional implications of plaintiff's lower back pain.  Tr. 352-55, 391-99.  However on one occasion in July 2006, Dr. Loudermilk filled out an RFC questionnaire that stated plaintiff could walk less than one city block before needing to rest, could sit for one hour and stand for ten minutes at one time, and would need three to four unscheduled breaks during an eight hour workday.  Tr. 352-55.  Dr.

18

Loudermilk further stated that plaintiff had reduced ankle range of motion, abnormal gait, mild dizziness and concentration difficulties. Tr. 352-55. Dr. Loudermilk, a board-certified anesthesiologist, opined that plaintiff would not be able to meet the standing and walking demands of light work, but expressly identified the January FCE as the clinical basis for his impairments. Tr. 352-55.

The January 2006 FCE revealed that plaintiff could perform heavy work, with some limitations on walking and crouching. Tr. 15, 266-93. Dr. Loudermilk essentially agreed with this opinion, although he believed that plaintiff had some additional limitations due to depression. Tr. 15, 319-20, 322, 324. The ALJ found that the FCE and opinion by Dr. Loudermilk were consistent with the objective medical evidence, and gave them controlling weight. Tr. 15-16. The ALJ also found that plaintiff had additional limitations, based on his testimony. Tr. 16.

Dr. Loudermilk's July 2006 statement failed to specifically reference any lower back pain, despite plaintiff complaining of such pain to him in March 2006, which is the limitation plaintiff complains the ALJ failed to sufficiently consider. Tr. 352-55. Dr. Loudermilk never identified any functional limitations associated with lower back pain in his March notes or subsequently. Tr. 320, 391-99. The ALJ noted that after plaintiff began complaining of lower back pain to Dr. Loudermilk, he "did not perform any physical examinations after that time, and his treatment notes generally consist[] of a recitation of the [plaintiff's] subjective complaints and statements that his pain medications were working." Tr. 15. See Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004) (ALJ's finding that treating physician's opinion not persuasive upheld, in part, because his opinion was unsupported by his own treatment notes). In fourteen

subsequent visits with Dr. Loudermilk after the July 2006 statement, Dr. Loudermilk repeatedly

noted that the medications "improve his quality of life" and plaintiff "looked the best he has

looked since I have been taking care of him."  Tr. 388-404.  The ALJ is permitted to consider the

chronological proximity of the opinions.  It appears that the ALJ gave more weight to Dr.

Loudermilk's more recent opinions which discuss plaintiff's marked improvement from the July

2006 opinion.

The remainder of Dr. Loudermilk's treatment notes simply contained no objective

findings on which such restrictive limitations could be based, but rather, documented only

plaintiff's subjective complaints of pain.  Tr. 388-404.  See Mastro, 270 F.3d at 178 (fact the

treating physician's diagnosis based largely on claimant's self-reported symptoms allowed the

ALJ to assign that physician's opinion lesser weight).  The ALJ's evaluation of a claimant's

subjective complaints of pain must "consider all [the] symptoms, including pain, and the extent

to which [the] symptoms can reasonably be accepted as consistent with objective medical

evidence."  20 C.F.R. § 404.1529(a).

The ALJ gave Dr. Loudermilk's singular July 2006 opinion little weight, as it was

"inconsistent with the objective evidence as a whole, Dr. Loudermilk's previous findings on

exam, the previous impartial functional capacity evaluation and Dr. Loudermilk's own previous

opinions."  Tr. 16.  See Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) (where the treating

physician's opinions themselves are inconsistent, they should be accorded less deference).  There

does not seem to be a medical basis to support a change in Dr. Loudermilk's assessment from

February 2006 to his opinion in July that plaintiff was more significantly limited.  If any of the

evidence, including medical opinions are inconsistent with other evidence or is internally

inconsistent, all of the evidence is weighed and a disability determination is made based on all of the evidence.  20 C.F.R. § 404.1527(c)(2).

"[A]ccording to the regulations promulgated by the Commissioner, a treating physician's opinion on the nature and the severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Mastro 270 F.3d at 178; see also 20 C.F.R. § 416.927.  Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  Craig, 76 F.3d at 590.  "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence."  Mastro at 178; see Hunter, 993 F.2d at 35.

Dr. Loudermilk opined on one occasion that it was his professional opinion that plaintiff "cannot return to his job as a correctional officer."  Tr. 352.  A "medical opinion" is a "judgment [ ] about the nature and severity of [the plaintiff's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions.  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  However, statements that a patient is "disabled" or "unable to work" or similar statements are not medical opinions.  These are administrative findings reserved for the Commissioner's determination, and they are not due special significance.  20 C.F.R. 404.1527(e)(1), (3).  However, ALJ essentially agreed with Dr. Loudermilk that plaintiff was unable to return to his job as a correctional officer when he ruled that plaintiff was unable to perform any past relevant work at step four of his evaluation.  Tr. 17.

21

This court finds the record adequately supports the ALJ's decision to attribute greater weight to the majority of the treating physician's evidence and to discount the *one* instance in which the treating physician indicated that the plaintiff had significantly reduced functional capacity.  The medical record, when taken in it's entirety, is supports the ALJ's finding that plaintiff could perform a range of light, unskilled work.

If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).  There is substantial evidence in the entire medical record that supports the ALJ's finding that the plaintiff was limited in his work ability but could perform light, unskilled work described by the ALJ, those jobs exist in significant numbers in the regional economy, and plaintiff was therefore not disabled.

## IV.  CONCLUSION

For the foregoing reasons, it is ORDERED that the Commissioner's decision to deny plaintiff disability benefits is AFFIRMED.

AND IT IS SO ORDERED.

_____
DAVID C. NORTON
CHIEF UNITED STATES DISTRICT JUDGE

March 25, 2011
Charleston, South Carolina

22